**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1793-18

ALAN E. MEYER, Receiver
for CLARKE BROTHERS, INC.,
and CLARKE BROTHERS, INC.,
a New Jersey Corporation,

     Plaintiffs-Appellants,

v.

MICHAEL CONSTANTINOU,
JAMES CONSTANTINOU, SJ
PRODIGY, INC., HAN J. LIM
d/b/a ATLANTIC CLEANERS,
SILVER HANGER OF
MANASQUAN, INC., JOHN
O'CONNOR d/b/a ATLANTIC
CLEANERS, and MANASQUAN
PLAZA, INC.,

     Defendants-Respondents.

Argued February 1, 2021 – Decided April 16, 2021

Before Judges Currier, Gooden Brown and DeAlmeida.

On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Docket No. L-5712-08.

Marguerite Kneisser argued the cause for appellants (Carluccio, Leone, Dimon, Doyle & Sacks, LLC, attorneys; Robert L. Gutman, of counsel and on the briefs; Marguerite Kneisser, on the briefs).

Mary Lou Delahanty argued the cause for respondents Silver Hanger of Manasquan and John O'Connor (Delahanty & McGrory, LLC, attorneys; Mary Lou Delahanty, on the joint brief).

Paul H. Schneider argued the cause for respondents Michael Constantinou, James Constantinou, and Manasquan Plaza, Inc. (Giordano, Halleran & Ciesla, PC, attorneys; Paul H. Schneider and David J. Miller, on the joint brief).

PER CURIAM

This appeal arises from a dispute over the source of environmental contamination caused by the discharge of tetrachloroethylene (also known as perchloroethylene or PCE) onto property owned by plaintiff Clarke Brothers, Inc. (CBI). CBI operated a gasoline station and an automobile repair facility on the property and discovered the PCE contamination while remediating chemicals that had leaked from its underground storage tanks.

 A-1793-18

# I.

In 2008, CBI and its receiver, Alan E. Meyer (collectively, plaintiffs), filed a complaint against the owners of an adjacent three-unit shopping center[1] and the owners and operators of the dry-cleaning business that leased one of the units.[2] The complaint alleged that the dry-cleaning operations caused the discharge of PCE, which migrated downhill onto the CBI property, and that the PCE contamination prevented plaintiffs from selling their property and decreased its market value. Plaintiffs sought relief under the New Jersey Environmental Rights Act (ERA), N.J.S.A. 2A:35A-1 to -14, the New Jersey Spill Compensation and Control Act (Spill Act), N.J.S.A. 58:10-23.11 to -23.24, and various common law causes of action.[3]

---

[1] Defendants Michael and James Constantinou purchased the shopping center property in 1993 and constructed a new building in 1995. The following year the Constantinous began leasing a portion of the shopping center property to a dry-cleaning business – Atlantic Cleaners.

[2] Atlantic Cleaners was purchased by defendant Silver Hanger of Manasquan, Inc. in 1996. Silver Hanger was owned by defendant John O'Connor and Robert Kowalski. In 2007, Silver Hanger sold its assets to defendant Han Lim and S.J. Prodigy. The business continued to operate as Atlantic Cleaners throughout this litigation.

[3] In 2010, the Constantinous transferred title to the shopping center property to defendant Manasquan Plaza, Inc. Each brother owned fifty percent of the shares of Manasquan Plaza.

3

A.

In November 2011, Silver Hanger and O'Connor filed a motion to refer plaintiffs' action to the New Jersey Department of Environment Protection (DEP) pursuant to N.J.S.A. 2A:35A-8, "the statutory provision of the ERA that directs a court to remit parties to administrative proceedings that are 'required or available to determine the legality of the defendant's conduct.'" Meyer v. Constantinou, No. A-4163-11 (App. Div. Nov. 15, 2013) (slip op. at 8).

On March 12, 2012, the trial court signed an order dismissing the complaint without prejudice and referring the environmental claims to DEP which was "actively enforcing the environmental laws" with regard to the CBI and Constantinou properties.

CBI appealed from the March 2012 order. We affirmed, holding that plaintiffs had the ability "to cooperate with DEP in determining the extent of the contamination and the scope of the cleanup" and that after accomplishing those objectives, they could move to reinstate the complaint. Id. at 16.

During the pendency of the appeal, the court entered a final judgment of foreclosure against the CBI property. A sheriff's sale took place in January 2019 and the deed was transferred to the buyer on March 13, 2019.

After this court affirmed the order of referral to DEP, the Supreme Court released its decision in Magic Petroleum Corp. v. Exxon Mobil Corp., 218 N.J. 390, 409-10 (2014), which held that under the Spill Act, property owners could file contribution claims in New Jersey Superior Court and the court could allocate liability before final resolution of a site remediation plan.

Therefore, on August 6, 2014, plaintiffs filed a motion for the trial court to reconsider its decision to refer the matter to DEP. The motion was granted and the matter returned to the trial court.

B.

Silver Hanger and O'Connor filed a motion for summary judgment seeking, among other things, to dismiss the ERA claim on the basis that plaintiffs failed to establish a continuous or intermittent violation. In their reply papers, these defendants asserted that plaintiffs' expert opinion was net opinion and should be barred. The court denied the motion and found the issue of net opinion had not been properly raised. A subsequent motion for reconsideration was also denied. Plaintiffs and Lim reached a settlement agreement in May 2016 and the claims against those defendants were dismissed.

Plaintiffs were permitted to proceed on their claim for consequential damages as they produced two contracts for the sale of the property which they

5

alleged they were unable to consummate because of their financial condition and inability to undertake the necessary remediation to sell the property.

## II.

The case proceeded to a bench trial before Judge Jamie S. Perri over seventeen days between October 30, 2017 to December 14, 2017. On the first day of trial, defendants Silver Hanger and O'Connor requested a N.J.R.E. 104 hearing for the court to determine whether plaintiffs' expert – Christopher Neuffer – had sufficient qualifications to support his testimony. Counsel also argued that Neuffer's expert report was net opinion.

Because the case was proceeding as a bench trial, Judge Perri declined to conduct a Rule 104 hearing. She reasoned that because there was no jury, she could hear the expert's testimony and subsequently determine the net opinion issue.

After plaintiffs completed their presentation of evidence, defendants moved for dismissal of all claims under Rule 4:37-2(b). The court granted the motion only for dismissal of the claims asserted against O'Connor for personal liability.

On October 29, 2018, the court issued a comprehensive written opinion finding plaintiffs had not proven their claims and entering judgment in favor of

defendants. Judge Perri determined that plaintiffs' expert, Neuffer, had provided only a net opinion which could not support their claims. She stated further that, even if she had considered his opinion, Neuffer's testimony was not sufficiently credible to support a finding of proximate cause. The court also found plaintiffs could not pursue a cause of action under the ERA under the presented circumstances. The court memorialized its decision in a November 13, 2018 order.

### III.

On appeal, plaintiffs contend the trial court erred in: (1) finding Neuffer offered an inadmissible net opinion; (2) dismissing their claims under the ERA; and (3) dismissing the liability claims against O'Connor personally.

To provide context for our decision, we provide the following facts elicited at trial.

CBI Property

Brothers Peter and John Clarke formed CBI in 1976 and, shortly thereafter, CBI purchased an existing gas station and automotive repair shop. They operated the business as a Gulf Service station. A one-story, four-bay cement block building was located in the central portion of the CBI property. Storage sheds and trailers were located along the property's northeastern border

adjacent to the shopping center owned by the Constantinous. The diesel fuel dispenser was located on the southeast corner of the property, and the gasoline pump island was located on the east side of the building.

The property also contained five underground storage tanks (USTs), including three gasoline tanks, one diesel tank, and one waste oil tank. The gasoline and diesel tanks were located on the south side of the service building; two tanks held 8000 gallons of gasoline, one tank held 6000 gallons of gasoline, and one tank held 3000 gallons of diesel fuel. Gulf Oil replaced the gasoline tanks in the late 1980s or early 1990s.

On the north side of the building, an underground tank held 250-275 gallons of waste oil. This tank was present when the Clarke brothers purchased the property and was not replaced. Peter testified that he and his brother did not use that tank in their business.[4] Instead, they used above-ground waste oil tanks.

Peter said he and his brother never used PCE in the business. To clean tools, they used a spray can of cleaner "that anybody can buy." They would spray the brakes "to keep the dust down" and blow them dry. He did not know

---

[4] Plaintiffs took Peter's de bene esse deposition in 2009. He died prior to the trial. The videotaped deposition was played in court.

 A-1793-18

the name of the spray can products or their chemical composition. He stated that no other maintenance work required the use of the spray cans.

In 2000, CBI closed the gas station due to the cost of equipment upgrades. It retained Meridian Environmental Services (Meridian) to remove the four gasoline tanks and the piping connecting the tanks to the pumps. Peter testified that they retained an environmental company because they had "very generous offers" to buy the property, but "no one would buy it until everything was removed."

During his deposition, Peter acknowledged having "difficulty remembering." He did not recall the name of the company retained by CBI or the date it removed the tanks. He also did not recall any assessment by DEP of penalties against CBI, a letter from the municipality warning against his intention to spread contaminated soil over his property, or the date when the contaminated soil was removed.

In August 2000, Meridian removed the pump island, three gasoline USTs, and the diesel fuel UST; the inspection of each tank did not reveal any holes.

In removing the waste oil tank, located adjacent to the dry-cleaning business, Meridian found "pea-sized holes" at one end of the tank. Therefore, the company collected a soil sample from that area of the tank. An analysis of

9

the sample detected total petroleum hydrocarbons (TPH), including heating and diesel oil. Based on the presence of TPH, the sample was further analyzed for volatile organics that were associated with waste oils or petroleum products. The scan detected xylene slightly in excess of DEP standards.

Meridian lined the waste oil tank excavation with plastic before filling it with clean soils and called the DEP hotline to report a discharge of hazardous substances. Because the waste oil tank was located between CBI's service building and the Constantinous' adjacent property, no further excavations in this area were done. Meridian backfilled the excavations around the USTs and removed a truckload or approximately twenty-five tons of suspected contaminated soil. It stockpiled a small amount of contaminated soil on site.

In September 2004, during a site visit by the municipality's Director of Code Enforcement, Peter stated he intended to spread the stockpiled soil over the property. In a letter dated October 5, 2004, the director "strongly suggested" that Peter refrain from disturbing "the pile of soil" without getting permission from the State. Nevertheless, CBI used the stockpiled soil to grade off the surface of the former tank excavation area after the soil had settled.

A-1793-18

As stated, the brothers had decided to sell the property. CBI was in financial trouble. Peter testified there were substantial tax liens on the business and property for some time, even prior to John's death in December 2005.

CBI executed a contract of sale with a developer to buy the property for $600,000 in March 2005. The contract was contingent in part on CBI obtaining a no further action (NFA) letter from DEP, indicating the property was clear of any contaminants.

When the potential buyer retained an engineering company to perform a survey of the property, the company detected two areas of chemical contamination on the north side of the property between the service building and adjacent shopping center, and one area of oil contamination in the northwest corner. Although the buyer was willing to go forward with the sale, CBI was unable to obtain an NFA letter. The buyer cancelled the contract in August 2007.

Peter's former wife testified during the trial that she recalled interest in the property but she was unsure if there were other offers. She and Peter testified that the cancellation of the executed contract and the inability to find a different buyer due to the PCE contamination had a financial impact on the business and on their personal finances. When Peter closed the auto repair shop in December

2006, his wife said there were federal and state tax liens on the property in addition to "many outstanding debts, not only to the IRS but to the -- vendors and to the [municipality], property taxes."

In December 2006, the court appointed Meyer as fiscal agent to "marshal" CBI's books and records, and to pay expenses. In June 2007, at the request of John's widow, the court appointed Meyer as receiver for CBI to manage the sale of its property and determine its liabilities. At the time, CBI had no liquid assets or available funds.

In March 2008, a second entity offered to purchase the CBI property for $700,000 "with numerous contingencies." The buyer intended to build condominiums on the property. He stated that groundwater contamination was a "deal breaker" for him because it would significantly impact the property's value.

During the course of negotiating the contract and the contingencies, Peter and the potential buyer learned from Neuffer that his investigation confirmed that PCE had contaminated the groundwater. The buyer terminated the contract. Meyer made no further effort to sell, rent, or lease the property after the two potential buyers withdrew their purchase offers. Because of the accrual of taxes

12

and penalties, the property ultimately went into foreclosure and was sold during the pendency of the litigation.

Plaintiffs' claim against defendants was for the consequential damages they alleged were incurred as they were unable to consummate two contracts for the sale of their property because of their financial condition and inability to undertake the necessary remediation to sell the property.

Atlantic Cleaners

The shopping center owned and constructed by the Constantinous was located about twenty to twenty-five feet from the CBI service building. There was a fence along the northern border between the properties. Neuffer stated that beyond the rear door of the dry-cleaning business was a concrete sidewalk, then a two-foot area of soil up to the fence separating the Constantinou property from the Clarke property. The fence was on the northern property boundary of CBI adjacent to the soil excavation conducted for the former waste oil tank. The distance from the rear door to the Clarke Brothers property was approximately six feet.

As stated, O'Connor and his partner, Kowalski, purchased the shares of Silver Hanger and took over a lease in the shopping center from the owner of a dry-cleaning corporation. They also purchased the dry-cleaning equipment from

the prior owner. In June 1997 they opened Atlantic Cleaners. The partners hired O'Connor's wife and son and Kowalski's wife to assist in the daily operations of the company.

O'Connor had no prior experience operating a dry-cleaning facility. Before purchasing the business, he and Kowalski spent five days observing the operation of another dry cleaners. After the purchase, O'Connor's son and Kowalski's wife attended two or three weeks of training on the operation of dry-cleaning machinery. During the first two months of its operation, the prior owner provided two people to work at the dry cleaners and assist with the transition to make sure the operation was "running as planned."

At first, O'Connor's son and Kowalski's wife were the only people who operated the dry-cleaning machine. However, after retiring from his principal job in 1998, O'Connor attended a three-week training course on the operation of dry-cleaning machinery conducted by the National Cleaners Association (NCA).

Until 2000, O'Connor worked mostly on weekends. He operated the dry-cleaning machine alone or assisted his son. Kowalski's wife left the business in 2000 and for the next year O'Connor worked there three to four days a week. In 2001, he left to join a family-owned business, but returned to Atlantic Cleaners

A-1793-18

in 2002 and worked there "three days on, three days off, a week on or a week off."

Atlantic Cleaners used a Multimatic dry-cleaning machine which contained a closed-vent system with carbon absorbers to remove vapors from the system. Atlantic also purchased a containment tank from the manufacturer of the dry-cleaning machine. The ten-inch-high steel tank went under the machine and surrounded it on all sides, with two feet extending behind the motor pumps and button traps, and one foot in front, so any leaks of PCE would fall into it. The dry-cleaning machine was used three times a day for five days a week. Only O'Connor and his son, and Kowalski and his wife could operate the machine and remove and dispose of its waste.

At the time of his purchase of the business, O'Connor was aware that the dry-cleaning machine used a chlorinated solvent, PCE. During the ten years that O'Connor owned and operated the business, Atlantic Cleaners used PCE. O'Connor described PCE as a carcinogen. He was aware of OSHA regulations and requirements regarding its handling and storage.

O'Connor testified that the PCE used in the dry-cleaning machine discharged vapors. In 1999, Atlantic Cleaners purchased a halogen device to measure the volume of PCE in the air. By 2000 the employees were using the

15

halogen device every day. O'Connor said "there were times when we would detect a vapor leak, which would require a gasket to be changed. And that was the benefit of it."[5] He usually operated the dry-cleaning machine in the morning to shield his employees and customers from exposure to the PCE vapor.

O'Connor said that a vendor placed the PCE in the machine. Deliveries were made through the rear door of the business and the vendor would place a drum containing PCE into the "button trap," which would "move the chemical into the machine." The solvent was used in lieu of water and detergent to remove dirt and stains on clothes.

The PCE and its waste by-products were removed daily from the machine. A spout with an open valve would drain the "wastewater" into a three-to-five-gallon plastic bucket that hung from the back of the machine. After the machine was shut down and the lint, waste bucket, and strainers were cleaned, the operator would carry the uncovered bucket over the waste containment tank and then pour the wastewater into an unlocked plastic receptacle, lock the receptacle, and put the bucket back on the machine for use the next day. O'Connor estimated they collected a quart of wastewater a day. He stated there was no floor drain near the machine.

---

[5] Gaskets held the filters in place.

16

The Atlantic Cleaners employees also changed the spent filters that removed impurities from the solvent, and they removed sludge and lint from the machine. The filters, sludge, and lint collections contained traces of PCE. There were separate receptacles for wastewater, sludge, and lint which had lids and were kept a few feet behind the back of the machine, approximately twenty-five feet from the rear door of the business.

Atlantic Cleaners used a licensed disposal company to remove the wastewater, sludge, and lint receptacles and replace them with new containers. On average, the company removed the wastewater container about once a month. If the bucket was close to full, O'Connor or another employee would ask the disposal company to remove it. He said the disposal company would place the locked receptacle on a dolly and remove it through the rear door. The lint and sludge receptacles were removed every two to three months.

The dry-cleaning machine was serviced as needed by specialized individuals recommended by the manufacturer. O'Connor, his son, Kowalski, and his wife also performed service and maintenance on the machine. On every day of use, the operator felt around the machine for residue and visually looked under it "to see if anything was dripping." The operator also conducted daily inspections of the "pipe connections, fittings, couplings and valves," in areas

17

where PCE came through, as well as the pumps, filter gaskets, solvent tanks and containers, and the water separator. As stated, the operator also performed daily inspections using the halogen detector to determine whether there were any PCE leaks.

O'Connor testified that his employees used "checklists from day one" to show the business complied with inspections and the handling of any PCE leaks. The business kept daily records and weekly condenser temperature and leak inspection logs recommended by DEP.

According to O'Connor, PCE was ordered "as needed," with deliveries occurring every three to four months. Each delivery consisted of approximately 19.2 gallons of PCE solution with approximately sixty-seven gallons delivered annually.

O'Connor never witnessed or heard anyone report a spill of wastewater on the premises or a discharge to the environment. He specifically denied ever having a spill in the area outside the dry cleaner's back door.

O'Connor was aware of self-contained leaks in the steel tank of the dry-cleaning machine. He stated:

> And I think I mentioned yesterday that we found many times with our hands that there would be a residue and you would change the gasket. We did have a leak or two, few leaks that we had over the course of the years.

18

It's a machine. That's why we put the container tank there.

O'Connor was aware of approximately five to ten gasket leaks of PCE during his ownership and operation of Atlantic Cleaners. He performed two of the repairs himself. In one instance, he notified DEP, but it was not a "reportable incident" because the leak was contained in the tank and "did not hit the environment." He also recalled a leak of PCE into the motor pump, which he fixed by tightening a fitting. On the other occasions, Kowalski fixed the leaks by replacing gaskets.

O'Connor explained that any leaks from the machine went into the steel containment tank, where rags would soak up the chemical. The operator then wrung out the rags in the button trap, placed them back into the machine and ran the cycle again. O'Connor said he learned this procedure during his training at the NCA. He further explained: "There's no drips into the containment tank, it means that it was just moisture starting to come, it was indicating that the gasket was starting to corrode and needed to be inspected." He also advised that government authorities inspected the dry-cleaning operations during his years of ownership, and the business was never cited for noncompliance with any laws or regulations. O'Connor testified he did not learn of any PCE contamination of

either the CBI property or the Constantinou property until after the sale of the dry-cleaning business.

In May 2007, Silver Hanger sold the business to Prodigy, which was owned equally at the time by Lim and his mother. The sale included the dry-cleaning machine.

Before buying the business, Lim received training for two weeks from Kowalski. Lim used PCE in the same dry-cleaning machine until July 2012, when he bought a new machine that used a non-hazardous cleaning substance. He replaced the machine because it was "old and wearing down." He denied any leaks of PCE while the old machine was in place. He was still operating Atlantic Cleaners at the time of trial.

Michael Constantinou also testified at trial. He stated he was unaware of any spill of PCE within or outside of the dry-cleaning premises while Silver Hanger owned the operation. He did recall Lim telling him of an incident in 2012 when PCE leaked from the machine onto the floor inside the dry-cleaning store. He also described a second incident in 2012 when the disposal company that removed the waste spilled some of it onto the sidewalk behind the dry cleaners. The Constantinous reported that spill to DEP, which investigated and tested the wastewater and had no concerns. According to Michael, DEP stated

20

there was no indication of any PCE in the spilled wastewater. Both of these events occurred after Atlantic Cleaners was sold to Lim and after the lawsuit was filed.

Counsel also questioned O'Connor about the grade level of the Constantinou property as compared to the CBI property. He said that from 1997 to May 2007 the Constantinou property was lower than the CBI property. He described that after rain storms the water flowed from the CBI property into the rear door of the dry cleaners.

Michael Constantinou also recalled that "for the longest period of time" the CBI property was higher than the Constantinou property. However, after the Clarkes excavated some of the soil on their property, Michael stated the Constantinou property had a higher elevation by one or two inches.

Remediation of the CBI Property

In February 2005, DEP conducted a compliance evaluation and found violations related to the August 2000 removal of the USTs on the CBI property. It ordered CBI to submit a site investigation report detailing the prior removal of the storage tanks and a remedial investigation report.

The following year, CBI retained Neuffer and his company, Envirotactics, Inc. – a consulting company that performed environmental investigation and

remediation work. In March 2006, Envirotactics prepared a remedial investigation report regarding the removal of the five USTs by Meridian. As previously noted, Meridian had found surficial contamination, meaning it was limited to the upper two feet of soil, and attributed it to a spilling or overfilling of the tanks. Relying on Meridian's findings, Envirotactics determined that no additional investigation or remediation was required with the exception of the waste oil tank. It proposed additional soil excavation, disposal, and post-excavation soil sampling in the waste oil tank area, along with disposal of soils "impacted by the gasoline tank overfill release."

In following through with its proposal, Envirotactics conducted its first excavation in the area of the former waste oil tank to remove contaminated soils, and also performed post-excavation sampling. Envirotactics also re-excavated and removed approximately one foot of the contaminated soil which had been spread over the area of the former gasoline and diesel fuel oil tanks and stockpiled it with the soil removed from the area of the waste oil tank.

The company also collected eight soil samples along CBI's property line with Manasquan Plaza. The purpose of the samples was to document that all the contaminated soil had been removed and that the vertical excavation was complete. One of the eight samples, taken at the western end of the excavation

22

(the farthest distance from the Constantinou property), detected the highest level of TPH and was sent to a laboratory to analyze for volatile organics. PCE was detected at a reported level of 120 ppm, which was above the DEP's most stringent cleanup criteria.

Thereafter, Envirotactics conducted additional soil excavation along the northern end of the property adjacent to the fence along the property boundary and collected post-excavation samples. Testing of the samples revealed PCE. The company also removed approximately twenty tons of soil, which it stockpiled separately.

In late March 2006, Envirotactics collected three additional soil samples to determine whether the PCE contamination was due to an off-site discharge. Two samples were collected about one foot from the fence; one sample was collected on CBI's property directly opposite the rear door of the dry cleaners and the other was collected approximately twenty feet to the east towards the area of the former waste oil tank. All three samples detected PCE, with the two samples near the property line indicating higher concentrations.

On May 2, 2006, Envirotactics submitted a remedial action report addressing the February and March 2006 investigations. Although acknowledging soil sampling in the area of the waste oil tank detected PCE,

23

Neuffer stated "reportedly, chlorinated solvents were not utilized by Clarke Brothers." He noted that "additional soil sampling was performed along the property boundary in the general area of the former waste oil tank and in an area away from the waste oil tank. PCE contaminated soil was identified in higher concentrations than those previously detected in the area of the waste oil tank."

Neuffer also reported that soils collected at the property line ten feet directly across from the rear door of the dry cleaners had "a distinct dry cleaning solvent (PCE) odor." He stated that "the surface drainage from the adjacent property containing the dry cleaning operation is towards the Clarke Brothers property." Therefore, he concluded, "it is apparent that the [PCE] has migrated onto the [CBI] site from the adjacent property that is operated as a dry cleaner." Neuffer requested DEP issue an NFA letter regarding the PCE on the CBI property.

DEP responded by requesting Envirotactics conduct more sampling to establish that the PCE contamination on the CBI property was not associated with the former USTs. In July 2006, Neuffer and Peter entered into a memorandum of agreement (MOA) with DEP, stating that an off-site source existed for the contamination detected on the CBI property and outlining certain environmental work to be performed.

In October 2006, Neuffer submitted a remedial investigation report to DEP for the PCE detected on the CBI property not associated with the USTs. The report addressed the excavations relating to the removal of the waste oil tank, and the test results of various samples. It noted that higher concentrations of PCE were detected along the northern boundary, that the soils near the dry cleaners had a distinct PCE smell, that CBI did not use chlorinated solvents in its auto repair services, and that the dry cleaners recently installed a new system. Envirotactics concluded: "Since soil sample results confirm that the PCE contamination has migrated onto the Clarke Brothers property from an offsite source, no further investigation or remediation is proposed. Clarke Brothers is not responsible for contamination originating from an offsite source."

The same month, DEP issued an Administrative Order and Notice of Civil Administrative Penalty Assessment to plaintiffs of $26,000 for violations, including the failure to submit a site investigation report, to determine the classification of wastes, and to submit a remedial investigation report. DEP also cited CBI for failure to remove the contaminated soil. In February 2008, DEP and Meyer on behalf of CBI entered into a settlement agreement that addressed the violations and enforcement actions and imposed a reduced penalty of $13,000.

In the interim, in March 2007, Envirotactics submitted a remedial investigation report to obtain an NFA letter for the tank-removal investigation and remediation. The company conducted groundwater and soil investigations and concluded that no further investigation of groundwater was necessary and that the only outstanding issue was the disposal of the stockpiled soil. On July 6, 2007, Envirotactics reported to DEP that the stockpiled soil was properly disposed of and requested an NFA letter with a covenant not to sue for the USTs removals.

In June 2007, Neuffer collected three samples near the rear door of the dry cleaners. These samples detected PCE, with the highest level being next to the concrete sidewalk at the rear of the dry-cleaning operation. The concentrations exceeded DEP's most stringent cleanup criteria. Neuffer stated these levels far surpassed the highest concentration of PCE in any sample taken from the CBI property.

In its remediation investigation report addendum dated August 2007, Envirotactics wrote that the additional soil sampling on the Constantinou property identified higher levels of PCE than previously detected at the property boundary. Therefore, Neuffer concluded again that the contamination on the CBI site came from Atlantic Cleaners. He supported his conclusion with the

26

same reasons he had previously presented in his May 2006 report: (1) CBI did not use chlorinated solvents; (2) PCE was a common chemical used in the dry-cleaning industry; (3) the rear door of the dry cleaners opened to a sidewalk that ran along the northern property boundary directly adjacent to the soil excavations for the former waste oil tank; (4) surface drainage ran from the adjacent property containing the dry cleaners towards the CBI property; (5) PCE contamination was surficial and present at the greatest levels on the adjacent property; (6) PCE concentrations increased with the distance away from the former waste oil tank; (7) samples collected on the adjacent property had high levels of PCE and "a distinct dry cleaning solvent odor"; and (8) the dry cleaners had reportedly replaced its dry-cleaning machine.

On October 5, 2007, DEP issued an NFA letter and covenant not to sue, informing Peter that no further action was necessary for the remediation of contamination caused by the USTs. However, the NFA did not encompass the PCE contamination found on the CBI property.

The letter stated that the PCE found on the CBI property "is from an unknown source unrelated to the [waste oil tank area of concern]." "In order to identify any areas of concern that may be contributing to the noted contamination, or alternatively, confirm that the source of this PCE

27

contamination is from off-site, a Preliminary Assessment pursuant to N.J.A.C. 7:26E-3, is necessary."

In July 2008, Envirotactics collected eight soil samples and three groundwater samples on the CBI property to determine the effect of PCE on the groundwater. Neuffer testified that the additional work was done because a purchaser was interested in the property.

In a letter to Peter dated August 4, 2008, Envirotactics reported that the PCE contamination was the result of a discharge from the adjacent Constantinou property, and that the groundwater was significantly impacted. Due to the high levels of contamination on the adjacent property and the depth of groundwater contamination on the CBI property, Envirotactics concluded that "it d[id] not appear feasible to remediate the subject property without also remediating the contaminated soil located offsite to the north." This letter was the last involvement Envirotactics had with the CBI property.

In January 2009, DEP's Bureau of Underground Storage Tanks (Bureau) sent a notice of deficiency letter to Peter, identifying the failure to remediate a discharge and to submit a preliminary assessment report in the required format.

In February 2012, the Bureau notified CBI of its failure to comply with the MOA and to evaluate and remediate the PCE on its property. The letter

noted that counsel for the Clarke Brothers had informed DEP that CBI did not intend to address the previously reported violations. It advised CBI that "based upon the investigation conducted to date, contaminants which are not normally related to the material stored in the UST(s) have been detected in the soil and groundwater on-site." The Bureau also informed CBI that it had to conduct a remedial investigation of groundwater unless it could demonstrate that the contamination came from an off-site source with no on-site contribution to show CBI was exempt from liability under the Spill Act.

The Constantinou Property and Remediation

In light of the information received from Neuffer regarding the Constantinou property, DEP sent a notice of deficiency to Lim and Michael Constantinou in January 2009 advising they had failed to remediate the PCE discharge. The letter stated that PCE was "a chemical not related to petroleum products sold or used at the Gulf Service Station, but was commonly used by dry cleaners." DEP required a vapor intrusion investigation to collect vapor samples from the soil and air to determine if levels of contamination were above the DEP cleanup guidelines. It also required a work plan that included proposals for sub-slab and indoor air sampling, and directed Atlantic Cleaners to enter into an MOA to address the contamination.

In March 2009, the Constantinous retained Practical Environmental Solutions, LLC to conduct a vapor intrusion investigation at the shopping center. A vapor intrusion system, approved by DEP, was eventually installed in the dry cleaners building.

The Constantinous also retained Stantec, an engineering and consulting company, which performed additional sampling to delineate the extent of the soil contamination and to characterize the groundwater on and off-site. A soil sampling taken in front of the CBI service building detected a low concentration of PCE. Sampling also identified elevated levels of PCE in the soil and groundwater in the location of the dry cleaners. Stantec opined that a discharge of PCE at Atlantic Cleaners caused the contamination near its building.

The Constantinous subsequently hired another environmental company to remediate the soil of PCE contamination both on their own property and on the CBI site.

Neuffer's Expert Testimony at Trial

Neuffer earned a Bachelor of Arts degree in industrial engineering and a Master's degree in environmental science. He worked for DEP in its Environmental Cleanup and Responsibility Act department and then for a private consulting company where he performed site investigations and

remediation. In 1995, he started his own company – Envirotactics. He was certified by DEP for subsurface investigations and closures of USTs, registered by the National Registry of Environmental Professionals as an environmental property assessor, and certified by the Institute of Hazardous Materials Management as a hazardous materials manager. In 2010, Neuffer became a DEP-licensed site remediation professional (LSRP), which allowed him to "sign off and close environmental cases."[6]

Neuffer was qualified by the court as an expert in the field of environmental sciences, including "the assessment and investigation of not only the source of location of the contaminant but all of the geological and hydro geological aspects of migration."

Neuffer testified that PCE was "a chlorinated volatile organic" that had a "specific gravity that's heavier than water and it's a typical chemical that's used in dry cleaning applications." He characterized PCE as a known hazardous substance and a carcinogen that required disposal by a licensed facility or reclamation recycling.

---

[6] Neuffer testified that the LSRP program replaced DEP's NFA letter for site remediation cases.

A-1793-18

Neuffer explained the first excavation conducted in February 2006 was in the area of the waste oil tank because when that tank was removed, there were holes in the tanks. He needed to take soil samples to assure DEP that the contaminated soil was completely removed. Neuffer testified he did not expect to find PCE in the soil because it had not been found in the area of the waste oil tank, and because Peter had denied using PCE "in his parts cleaning" or "as a parts degreaser or anything." A second deeper excavation continued to reveal PCE contamination.

Neuffer told the court that he suspected the PCE contamination was coming from "off site." He therefore took soil samples from under the fence situated along the CBI/Manasquan Plaza property boundary. The samples detected PCE, with the highest level of contamination coming from a sample taken from under the fence outside the rear door of the dry-cleaning operation.

Neuffer opined that a surface discharge at the adjacent dry cleaners was the source of the PCE contamination on the CBI property. He gave the following reasons: Peter denied using a chlorinated solvent on his property, whereas the dry cleaners used PCE; the soil samples collected near the dry cleaners smelled like solvents used for dry-cleaning; the concentrations of PCE were highest in soil samples taken outside the rear of the dry cleaners and decreased in all

32

directions from there; the topography sloped downward from the dry cleaners towards the CBI property; and the highest level of groundwater contaminants were detected directly behind Atlantic Cleaners.

Neuffer also noted that PCE was detected underneath the dry-cleaning facility, but not under the CBI service building, that PCE was the only contaminant detected in the area away from the waste oil tank, and that the dry cleaners had recently replaced their machinery. He further noted that the consultants who performed excavations on the Constantinou property concluded that there was a discharge of PCE from the dry cleaners.

Neuffer did not believe the PCE leaked from holes in the waste oil tank. He explained that PCE was usually detected in soil samples taken close to the surface, whereas the holes in the tank were below the surface. He also stated that PCE contamination would not travel from a greater depth to the surface, and that no PCE was detected in the area of the tank holes. He conceded he did not know the history of the waste oil tank or observe its piping, which could sometimes leak.

As stated, Neuffer relied on Peter's testimony that CBI did not use solvents to wash auto parts. He admitted he did not know the scope of vehicle repairs performed by CBI or whether CBI performed brake work, and he did not

investigate prior operations on the property. Neuffer stated he knew that solvents were used in auto repair work and that such products could contain PCE and conceded that CBI might have used small quantities of chlorinated solvents for cleaning parts or brakes. Nevertheless, even if CBI used small amounts of spray can solvents, Neuffer said he would not change his conclusion as to the source of the contamination.

Neuffer testified that he visually observed the properties and said:

> it was plain to see that the sidewalk was definitely higher than the level that was on the . . . other side of the fence. So it dropped off . . . [n]ot substantially, but then it was a gradual gradient away from this property toward the Clarke Brothers.

In Neuffer's opinion, the PCE migrated downgradient with rainwater from the Constantinou property onto the CBI property, and entered the ground vertically and horizontally. He said this explained why the soil sample with the highest level of PCE contamination was not found outside the dry-cleaning store but was found on CBI property.

Neuffer did not know exactly how the discharge or spill occurred but said it could happen a "wide variety of ways." For example, based on his prior experience with PCE, spent solvents from a dry-cleaning operation sometimes were stored outside the rear door and could spill. "There could be waste water

 A-1793-18

from mopping floors where there was a spill and you could discharge that out the back."  Likewise, "if you had filters from the dry cleaning machine or something if they were stored outside and rain water got on them, it could cause PCE to come out of the filters."

Although Neuffer never saw filters outside the rear of the dry cleaners, he said there were a "wide variety of potential ways that PCE could have been discharged to the surface."  He noted that the samples taken by Stantec detected no PCE in the soils below CBI's service building, but found PCE in the soil samples taken below the slab floor of the dry cleaners, with the highest concentration at the rear of the cleaning facility.  Moreover, he relied on Peter, who told him the dry cleaners had replaced its machinery.

On cross-examination, Neuffer acknowledged that he did not measure the exact topography of the properties and did not know the gradient of the CBI property before 2006.  Nor did he ask any of the property owners for information about the topography.  He also did not know what CBI used the sheds and trailer for or whether prior owners used the waste oil tank.

Neuffer explained that CBI did not ask him to prepare a preliminary assessment report or a phase I investigation, which would have provided information regarding the historical use of the properties.  If he had done so, he

A-1793-18

would have looked at the site history back to 1932 or when it was "naturally vegetated." However, he stated that he did not need to look at any other sources of information because his investigation focused on determining whether the dry-cleaning operation was the source of the contamination.

Neuffer acknowledged he had no personal information about a discharge of PCE from Atlantic Cleaners. He assumed the discharge occurred after the building was constructed because the spill was surficial. He did not see a discharge occur and neither Peter nor anyone else reported a discharge to him. He also never visited the dry cleaners, other than as a customer. He never saw where the cleaners kept the dry-cleaning equipment and did not ask O'Connor to see the record of PCE usage. In fact, he never had a conversation with O'Connor when he was conducting his investigation.

Neuffer further acknowledged that auto repair facilities commonly used solvents. However, he never investigated whether the activities on the CBI property caused or contributed to the PCE contamination on its property.

Neuffer advised that at some point after "all the reports" were prepared, he became aware that CBI used spray cans containing chlorinated solvents. He did not know when or how CBI used the products or the amount they used. He admitted making no determination regarding CBI's use of the spray cans. He

36

acknowledged that the use of spray cans of chlorinated solvents constituted the use of solvents, but explained that he did not think it was a potential source for the contamination.

When shown a receipt from an auto parts store that reflected CBI's purchase of a solvent, Neuffer did not recall seeing it before. He stated he did not inform DEP that the references in his reports about the non-use of chlorinated solvents were inaccurate, explaining the use of these spray cans did not affect the conclusions in the reports that he submitted or the "tank work."

Neuffer was questioned about specific soil samples. He testified that the sample taken from the waste oil tank excavation site, about ten feet from the end of the CBI service building, which detected PCE, was subject to dilution at the laboratory by a factor of 500% during testing. He did not know why the lab diluted the sample and could not say if or how the dilution affected the quantitative result. He did not place this sample on his isopleth map. Neuffer acknowledged that if the results without dilution had shown a higher concentration of PCE, they would have contradicted his opinion. Specifically, he acknowledged that if the soil sample had a much higher concentration of PCE than depicted in his reports, then "yeah, this isopleth would be totally different."

37

IV.

In a comprehensive written opinion dated October 29, 2018, Judge Perri reviewed the factual findings and assessed the credibility of the witnesses.

Judge Perri noted that Peter was the primary source of information regarding the Clarke's operation of its business and the use of its property. She stated that when his videotape deposition was conducted in December 2009, Peter was suffering from stage four renal cancer and had undergone extensive radiation and chemotherapy treatments. She described him as "very weak and frail. It was the court's impression that Peter's physical condition contributed to his inability to give credible, reliable testimony." The court found Peter could not recall the sequence of important events and did not seem to have the energy to give thought to the questions being asked. Therefore, she "put little credence in the accuracy of Peter's recollection or testimony, particularly with regard to critical liability issues."

Judge Perri also found that Neuffer was not a credible witness, explaining that he could not provide details on critical issues, he avoided responding directly to questions, he appeared "noticeably uncomfortable," he gave inconsistent testimony about Meridian's initial soil samples, he accepted Peter's

38

bare statement that CBI did not use solvents, and he did not satisfactorily answer questions on cross-examination.

The judge noted that "out of an abundance of caution" she qualified Neuffer "by virtue of his training and experience to offer opinions on matters of site investigation, remediation and determination of the source of contamination." However, after listening to Neuffer's testimony, despite his qualifications, Judge Perri found "Neuffer offered no real technical or scientific testimony at trial regarding the properties of PCE or how it interacts with the environment." She noted that his reports and his testimony did not address the specific properties of the chemical. The court also found that Neuffer did not offer testimony or modeling to explain, "on a chemical or physical level, how PCE would travel through rainwater over the ground or how its properties 'can affect travel and impact.'" In addition, the judge stated Neuffer did not discuss the effect of rainwater or the elements on PCE after it was introduced into the environment, "or correlate any such changes in the concentrations of PCE detected on both properties."

The judge stated that Neuffer:

> relied on such 'unscientific' bases for his opinion as his visual observation of a 'gradual downward slope' from the [Manasquan Plaza] property to the CB[I] property, which he opined permitted PCE to be transported by

rainwater to the CB[I] property. Even in this regard, he did not offer any data or measurements to support his opinion. He did not obtain a survey or perform any tests that would identify the actual slope of the property nor did he offer any evidence that the slope was sufficient to permit rainwater to travel to the other locations on the CB[I] property where PCE was detected. He did not explain how the topography or ground cover would impact on the manner and direction in which water would flow from the one property to the other which might explain the random nature of the deposits.

Judge Perri found these deficiencies and omissions affected "the weight and credibility that can be afforded to Neuffer's opinions." She elaborated that "Neuffer's willingness to accept Peter's bare statement that CB[I] did not use solvents in its auto repair business and his failure to perform any investigation of the historical use of the CB[I] property, casts serious doubt on the validity of his expert opinion."

The judge noted that the CBI property was used as a gas station before CBI purchased it, that CBI did not perform any environmental investigations prior to its purchase, and that it continued to operate a gas station and auto repair service on the property for thirty years before PCE was detected. Furthermore,

[d]espite Neuffer's knowledge of CB[I]'s casual attitude toward environmental contamination, as evidenced by the decision to simply spread the stockpiled contaminated soil on the property rather than disposing of it properly, Neuffer accepted at face value Peter's representation that CB[I] did not use solvents in its auto

repair business and relied on that fact in forming his opinion.

In addition, when Neuffer was confronted on cross-examination with the sales receipt establishing CBI's purchase of aerosol cans of solvents, she stated he "became hesitant and evasive." She also found Neuffer's credibility was diminished when he was unsure when or how he found out CBI did use spray solvents and in his concession that he did not advise DEP of the information.

Judge Perri further found that Neuffer's credibility was undermined by his "equivocal attempts" to explain why he did not perform a preliminary assessment of the property. She stated he appeared "noticeably uncomfortable when questioned about the failure to perform a [preliminary assessment]" and that he testified unconvincingly that he did not recall whether "he told Peter about the obligation to perform a [preliminary assessment]," despite repeated demands to do so by DEP. The court noted that if Neuffer had prepared a preliminary assessment and researched the historical use of the CBI property and other potential sources of PCE, it would have enabled him and DEP "to eliminate CB[I] as a potential source of the PCE contamination." The judge concluded that Neuffer or Peter "made an informed decision not to perform a [preliminary assessment], which might disclose CB[I]'s own responsibility for the contamination."

Moreover, the court found inconsistencies in Neuffer's testimony regarding the soil samples collected by Meridian in 2000. She noted that Neuffer testified that Meridian scanned one of the samples for PCE and none was found, which contradicted the March 2006 report in which he wrote that this sample was only analyzed for TPH.

Additionally, the court found Neuffer's explanation for the exclusion from his isopleth map and exhibits of the first soil sample taken from the CBI property that detected PCE, "less than credible." The judge noted Neuffer did not discuss "any anomalies" regarding the sample until cross-examination, when he acknowledged that the sample had a dilution factor of 500%. The court also noted, that in his report, Neuffer wrote that the sample had a PCE level of 120 ppm, without mentioning the undiluted reading. Notably, the court found that "[i]f in fact the undiluted reading had been included on the isopleth map, it would have substantially skewed the map 'results' and demolished Neuffer's theory."

Judge Perri determined that Neuffer based his opinion on three facts that were not supported by credible evidence. First, he assumed the PCE contamination came from the adjacent property because CBI did not use solvents, which was disproven. Second, he assumed the dry cleaners had

purchased a new dry-cleaning machine around the time the PCE contamination was discovered on the CBI property and relied on this assumption to prove the discharge came from the dry cleaners. But there was no evidence of a change in equipment at Atlantic Cleaners at that time. Third, he assumed a spill occurred at the dry cleaners and that the PCE was carried by rainwater onto the CBI property, with no scientific support or attempt to identify the degree of slope that led to the movement of the substance.

Therefore, the judge concluded that Neuffer offered a net opinion that could not support plaintiffs' claims. She stated further that, "[e]ven assuming that the opinion [was] not barred as a net opinion, the court would find that Neuffer's testimony on many key issues, as set forth above, was not sufficiently credible to support a finding that plaintiff had proven causation by a preponderance of the credible evidence."[7] The court dismissed plaintiffs' claims and entered judgment in favor of defendants.

V.

On appeal, plaintiffs argue that the court erred in finding Neuffer's testimony was inadmissible net opinion; dismissing its claims against O'Connor; and in dismissing its ERA claims. We are not persuaded.

---

[7] The court also considered and rejected plaintiffs' ERA claim.

## A.

In considering Neuffer's testimony and opinions, we turn to N.J.R.E. 703 as the foundational rule for expert testimony. Townsend v. Pierre, 221 N.J. 36, 53 (2015). This rule requires experts to support their opinions with "facts or data derived from (1) the expert's personal observations, or (2) evidence admitted at the trial, or (3) data relied upon by the expert which is not necessarily admissible in evidence but which is the type of data normally relied upon by experts." Ibid. (quoting Polzo v. Cnty. of Essex, 196 N.J. 569, 583 (2008)).

A corollary to N.J.R.E. 703 is the net opinion rule, which "forbids the admission into evidence of an expert's conclusions that are not supported by factual evidence or other data." Id. at 53-54. It requires an expert to "'give the why and wherefore' that supports the opinion, 'rather than a mere conclusion.'" Id. at 54 (quoting Borough of Saddle River v. 66 E. Allendale, LLC, 216 N.J. 115, 144 (2013)). An expert's opinion is inadmissible if it is "'based merely on unfounded speculation or unquantified possibilities.'" Id. at 55 (quoting Grzanka v. Pfeifer, 301 N.J. Super. 563, 580 (App. Div. 1997)). An expert also renders an inadmissible net opinion if the expert fails "to explain a causal connection between the act or incident complained of and the injury or damage allegedly resulting therefrom." Koruba v. Am. Honda Motor Co., 396 N.J.

Super. 517, 526 (App. Div. 2007); see Townsend, 221 N.J. at 57-58 (holding expert's testimony was net opinion to extent he speculated on causation by failing to apply his engineering expertise to present empirical evidence and by reconstituting facts). Experts must "be able to identify the factual bases for their conclusions, explain their methodology, and demonstrate that both the factual bases and the methodology are reliable." Townsend, 221 N.J. at 55 (quoting Landrigan v. Celotex Corp., 127 N.J. 404, 417 (1992)). Thus, "a trial court must ensure that an expert is not permitted to express speculative opinions or personal views that are unfounded in the record." Ibid.; see Koruba, 396 N.J. Super. at 526 (experts must "be able to point to a generally accepted, objective standard of practice and 'not merely to standards personal to the witness'") (quoting Fernandez v. Baruch, 52 N.J. 127, 131 (1968)).

The net opinion rule, however, does not require an expert to support or organize an opinion in a manner preferred by opposing counsel. Townsend, 221 N.J. at 54. Moreover, a court should not exclude an expert's testimony merely because it does not account for a particular fact or condition that opposing counsel considers relevant. Ibid. An expert who fails to give weight to a factor deemed important by an adverse party does not render an inadmissible net

opinion if the expert offers sufficient reasons that logically support the opinion. Ibid. Such an omission is a proper subject for cross-examination. Id. at 54-55.

The admission or exclusion of evidence lies in the sound discretion of the trial court. Id. at 52. We apply a "deferential approach to a trial court's decision to admit expert testimony, reviewing it against an abuse of discretion standard." Id. at 53 (quoting Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 371-72 (2011)).

We also defer to a trial judge's credibility determinations. Cesare v. Cesare, 154 N.J. 394, 412 (1998); Reese v. Weis, 430 N.J. Super. 552, 567 (App. Div. 2013). "Such deference is appropriate because the trial judge has 'a feel of the case' and is in the best position to 'make first-hand credibility judgments about the witnesses who appear on the stand.'" Reese, 430 N.J. Super. at 567-68 (quoting N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 194 (2008)).

Plaintiffs presented Neuffer as their liability expert. His ultimate conclusion was that the source of PCE contamination on the CBI property was the dry-cleaning operation at the adjacent shopping center. Our review of his extensive testimony reflects this opinion was not supported by the facts or any explained reliable methodology. Instead, Neuffer's testimony on the cause of the PCE contamination was speculative and based on his personal opinions.

As Judge Perri found, Neuffer did not provide any objective data to support his theory that rainwater carried PCE downhill from the dry cleaners to the CBI property. He acknowledged that he did not know how or when a discharge or spill occurred at the dry-cleaning facility, and he could not confirm that CBI did not use chlorinated solvents in its auto repair work.

Neuffer relied on three unfounded "facts" to support his causation opinion. First, he assumed the PCE contamination came from the adjacent dry cleaners because CBI did not use chlorinated solvents in the operation of its business. However, he did not investigate the history of the CBI property, did not know the contents of the waste oil tank during the years of use by the former owners, and did not confirm Peter's statement that CBI did not use PCE. He testified that CBI never asked him to prepare a preliminary assessment but said such an investigation was not necessary because his work focused on determining whether the dry cleaners was the source of contamination. Despite the letter from DEP requiring the assessment, Neuffer claimed there was no indication in any documents that such an assessment was necessary. And he did not believe that a preliminary assessment would have changed his opinion.

Moreover, Neuffer did not investigate Peter's claim that he and his brother never used PCE in their auto repair business, even though he conceded at trial

47

that auto repair facilities used chlorinated solvents and that after "all the reports were prepared," he became aware that CBI used spray cans that contained these solvents. Although Neuffer did not know when or how CBI used chlorinated solvents, or the amount or number of spray cans used over the years, he did not "think that having a spray can that may contain PCE would be a potential source for the contamination we identified." He never told DEP about the use of chlorinated solvents on the CBI property, although he knew the references in his reports about the non-use of chlorinated solvents was inaccurate. Thus, Neuffer's assumption that CBI did not use PCE on its property was not supported by the factual evidence.

Second, Neuffer assumed Atlantic Cleaners obtained a new dry-cleaning machine around the time of the discovery of the PCE contamination on the CBI property. He apparently believed this change in equipment was due to a discharge of PCE. He relied on the replacement of the machine as one of the eight reasons supporting his opinion that the chlorinated solvent contamination was due to the adjacent dry-cleaning operation, and included this "fact" in his May 2006 remediation report, and in its August 2006 remediation investigation report addendum.

A-1793-18

Neuffer, however, never visited the dry cleaners, other than as a customer, and never inspected the dry-cleaning equipment or saw the rear of the shop where the owners kept it. He also never spoke to O'Connor or anyone else at the time who worked at the dry cleaners, and never asked to see the records maintained by O'Connor for the dry-cleaning operations. Most importantly, Lim testified that he replaced the dry-cleaning machine in July 2012 – many years after the PCE was first detected on the CBI property. Moreover, Lim stated he replaced the dry-cleaning machine with one that used a non-hazardous cleaning substance and that he supplanted the machine because it was "old and wearing down." There was no evidence in the record that he replaced it because of a discharge of PCE at his dry-cleaning facility. Thus, Neuffer's testimony about the reason for the replacement of the dry-cleaning machine was speculative and unsubstantiated by any facts in the record.

Third, Neuffer assumed there was a discharge of PCE on the property of the dry cleaners and that the PCE was carried by rainwater onto the CBI property. He stated he followed the contamination gradient from the off-site source, found no indication of another source within that gradient, and observed that contamination levels continually decreased as they moved towards the CBI property.

49

Judge Perri found Neuffer provided no "scientific support for this hypothesis," that he failed to identify "the degree of the 'gradual slope' between the properties that would have permitted the transfer to occur," and that he did not explain how the migration of PCE led to "the levels plotted on the isopleth map." We cannot disagree.

Neuffer primarily relied on test results from soil samples taken on the two properties. He explained that a sample taken near the rear door of the dry cleaners indicated the presence of PCE at a level of 12,138 ppm, whereas the highest concentration of PCE on the CBI property "[r]ight under the fence line" was 393 ppm. When questioned, he acknowledged that a sample taken closest to the dry cleaners' rear door showed a PCE level of 850 ppm, saying "the numbers don't decrease exactly from the rear of the door."

Neuffer believed the isopleth map he created supported his opinion by showing that the PCE concentration increased closer to the dry cleaners, explaining its gradients matched the land's topography. However, he did not include the sample taken from the excavation of the waste oil tank and located only several feet from the CBI service building which detected PCE in excess of 12,000 ppm. He acknowledged that if he had included that sample on the

A-1793-18

map, the "isopleth would be totally different."  As the trial court described, this testimony was "the most devastating attack on Neuffer's credibility."

Neuffer's opinion on the downward gradient from the dry cleaners to the CBI property was based on his visual observation of the two properties in 2006. He explained: "[J]ust visually observing the property, it was plain to see that the sidewalk was definitely higher than the level that was . . . on the other side of the fence."  He did not investigate whether there were any changes in the gradient over time.

Neuffer relied on the gradient to explain the PCE found on the CBI property.  However, both O'Connor and Michael Constantinou testified that for a long period of time the Constantinou property had a lower topography than its neighbor.  O'Connor recalled that from 1997 through May 2007, water would flow after rainstorms from the CBI property to the rear door of his cleaners. Michael recalled that the topography changed after the Clarke brothers excavated some of the soil on their property, which left the Constantinou property higher by about two inches.  There is no evidence that Neuffer consulted topographic maps, soil surveys, or groundwater site maps in reaching his conclusion about the gradient or spread of the PCE contamination.  Nor did he consider the contrary testimony of other witnesses.

51

A-1793-18

In Neuffer's opinion, the PCE "spread out with rainwater" even where the gradient was "close to level." He testified that PCE was denser than water and tended to migrate vertically and then horizontally at greater depths, but he also claimed that the contamination on the CBI soil traveled horizontally from surface runoff. However, as stated by the trial court, Neuffer did not explain how PCE would travel through rainwater over the ground, address how its properties could affect "travel and impact," or discuss "the effect that rainwater or the elements would have on PCE" after its introduction into the environment. He therefore did not support his opinion with any scientific data or explanation.

The record also supports the trial court's determination that Neuffer was not a credible witness on key issues such as the source of the PCE contamination and how and why it migrated to the CBI property. For example, he could not explain why the specific soil sample with unfavorable readings for CBI was excluded from the isopleth map or why the lab diluted the sample. He also testified that in 2000, after removing the waste oil tank, Meridian conducted soil sampling that detected TPH and based on that result, it "ran an analysis for volatile organics" and detected xylene, but not PCE. In contrast, Envirotactics reported in 2006 that Meridian collected one soil sample from the area of the waste oil tank, which was analyzed only for TPH.

A-1793-18

We are satisfied the court did not err in finding Neuffer rendered a net opinion by inferring causation of the source of the PCE contamination without supporting facts, scientific data, or methodology.

## B.

Plaintiffs argue that the court erred in dismissing their claims against O'Connor. They contend O'Connor was personally liable for the PCE contamination under the tort participation theory, and that the operation of a dry cleaners was an abnormally dangerous activity. Again, we disagree.

At the conclusion of plaintiffs' case, O'Connor's counsel moved for his dismissal, arguing there was no evidence he engaged in any tortious conduct and that he did not act in a personal capacity outside of his role as principal of Silver Hanger. In granting the dismissal, Judge Perri stated there was no evidence to suggest "O'Connor in any way was involved in or instrumental in moving either PCE or PCE contaminated products out of the building to the location near the back door where plaintiffs' expert identified the principal spill." She explained:

> All of the contamination claims at issue in this case are with regard to soil contamination. And according to Neuffer, that contamination emanated from discharges or spills that occurred outside of the leasehold for the dry cleaner, but on the premises owned by the Constantinou[s].

So I find that there has been no evidence presented even under the rigorous standard under Rule 4:37-2(b) from which a reasonable fact finder could conclude that John O'Connor was personally involved in the discharge of PCE in a location where plaintiffs' expert has identified it as having been migrated from the Constantinou property to the Clarke Brothers property.

That is not to say that there may not ultimately be some consideration of liability with regard to Silver Hanger Manasquan by virtue of the actions of those non-testifying witnesses. And the [c]ourt may draw inferences with regard to that.

Following the ruling, plaintiffs' counsel requested an opportunity to brief the issue of whether O'Connor could be held personally liable. The court granted the request.

The next day, after additional oral argument on the issue, the court again found that plaintiffs had not proven O'Connor was personally liable under the participation theory for any discharge. Relying on Saltiel v. GSI Consultants, Inc., 170 N.J. 297 (2002), the court concluded that plaintiffs did not sustain their burden to show that O'Connor took part in the commission of a tort by the corporation and that, "under the facts and circumstances of this case," there was no other basis to impose personal liability on him.

A-1793-18

The court also found there was no evidence that the operation of a dry cleaner was an abnormally dangerous activity or that the use of the commercially available PCE was an abnormally dangerous activity.

At the close of a plaintiff's case, a defendant "may move for a dismissal of the action or of any claim on the ground that upon the facts and upon the law the plaintiff has shown no right to relief." R. 4:37-2(b). The standard for an involuntary dismissal is whether "the evidence, together with the legitimate inferences therefrom, could sustain judgment in plaintiff's favor." Ibid. Where reasonable minds can differ, accepting as true the evidence supporting the position of the non-moving party, and giving that party the benefit of all reasonable and legitimate inferences, the court must deny the motion. Verdicchio v. Ricca, 179 N.J. 1, 30 (2004). The court is not concerned with the worth, nature or extent of the evidence, but only with its existence viewed most favorably to the party opposing the motion. Dolson v. Anastasia, 55 N.J. 2, 5-6 (1969). We apply the same standard. Craggan v. IKEA USA, 332 N.J. Super. 53, 61 (App. Div. 2000).

The Spill Act provides that "any person who has discharged a hazardous substance, or is in any way responsible for any hazardous substance, shall be strictly liable, jointly and severally, without regard to fault, for all cleanup and

removal costs no matter by whom incurred." N.J.S.A. 58:10-23.11g(c)(1); N.J. Dep't of Envtl. Prot. v. Dimant, 212 N.J. 153, 175 (2012). The Spill Act defines a discharge as "any intentional or unintentional action or omission resulting in the releasing, spilling, leaking, pumping, pouring, emitting, emptying or dumping of hazardous substance into the waters or onto the lands of the State, or into waters outside the jurisdiction of the State when damage may result to the lands, waters or natural resources within the jurisdiction of the State." N.J.S.A. 58:10-23.11b. Although the Spill Act does not define the phrase "in any way responsible," the Supreme Court has interpreted it to mean "ownership or control over the property at the time of the discharge." Dep't of Env't Prot. v. Ventron Corp., 94 N.J. 473, 502 (1983).

Plaintiffs argue that the plain language of the Spill Act imposes personal liability on O'Connor because he had ownership or control over Atlantic Cleaners at the time of a discharge of PCE. O'Connor, however, did not own or control Manasquan Plaza or the Constantinou property. Moreover, although he was aware of several instances of a PCE leak inside the containment tank surrounding the machine, he testified there were no discharges of PCE into the environment during the years he operated Atlantic Cleaners. Any leaks noted

A-1793-18

were enclosed in the containment tank. The record contains no evidence to the contrary.

Plaintiffs further argue that, because a dry-cleaning facility is an abnormally dangerous activity, O'Connor is strictly liable for damages resulting from the PCE contamination on the CBI property. Because O'Connor was strictly liable, plaintiffs contend they are not required to establish fault. Plaintiffs' reliance on Ventron to support its argument is misplaced.

In Ventron, the Court held that "those who use, or permit others to use, land for the conduct of abnormally dangerous activities are strictly liable for resultant damages." Id. at 488. In that case, the defendant corporations dumped toxic mercury into a nearby creek, and the defendant Ventron expressly assumed the liability of one of them. Id. at 493.

Adopting the analysis in the Restatement (Second) of Torts § 520 (1977), the Court stated that whether an activity was abnormally dangerous was determined on a case-by-case basis after taking into consideration the following factors:

> (a) existence of a high degree of risk of some harm to the person, land or chattels of others;
>
> (b) likelihood that the harm that results from it will be great;

(c) inability to eliminate the risk by the exercise of reasonable care;

(d) extent to which the activity is not a matter of common usage;

(e) inappropriateness of the activity to the place where it is carried on; and

(f) extent to which its value to the community is outweighed by its dangerous attributes.

The Ventron Court concluded that "mercury and other toxic wastes were 'abnormally dangerous,' and the disposal of them, past or present, is an abnormally dangerous activity." Id. at 493. See T&E Indus., Inc. v. Safety Light Corp., 123 N.J. 371, 391, 394-95 (1991) (holding, under facts of case, the defendants were strictly liable for harm caused by their "processing, handling, and disposal" of radium).

Unlike Ventron, the operation of a dry-cleaning business does not qualify as an abnormally dangerous activity given its "common usage," "value to the community" and appropriateness of the activity to "the place where it is carried on." See Restatement (Second) of Torts § 520 comment f ("In determining whether the danger is abnormal, the factors listed in Clauses (a) to (f) . . . are all to be considered, and are all of importance.").

Moreover, O'Connor testified that Silver Hanger bought a containment tank from the manufacturer of the dry-cleaning machine to catch leaks, conducted daily measurements of PCE in the air, kept records of purchases and disposal of PCE, and recorded leaks in inspection logs. He and the other employees also received training on the use of the machinery. Thus, the likelihood of harm was not great. Plaintiffs have not demonstrated the applicability of any of the enumerated factors to categorize a dry-cleaning business as an abnormally dangerous activity.

C.

Plaintiffs also contend the court erred by rejecting their argument that O'Connor was personally liable under the tort participation theory. They contend that he participated or cooperated in the commission of a tort by Silver Hanger, and that he should not "escape the consequences of his individual wrongdoing by saying that he acted on behalf of a corporation."

In Saltiel, the defendant corporation entered into a contract with the plaintiff to design and prepare specifications for turf grass on athletic fields. 170 N.J. at 299. The plaintiff alleged the corporation was negligent in preparing and designing the specifications and that its officers were personally liable because they participated in the corporation's tort. Ibid. The sole issue on

59

appeal was whether the court erred by granting summary judgment in favor of the corporate officers. Id. at 302. To resolve the issue, the Court considered: "(1) the proper application of the participation theory of personal liability for tortious conduct by corporate officers under New Jersey law; and (2) whether the plaintiff's claim against [two corporate officers] sounds in tort or contract." Ibid.

The Court noted that the "essence" of the participation theory is "that a corporate officer can be held personally liable for a tort committed by the corporation when he or she is sufficiently involved in the commission of the tort." Id. at 303. It explained that "a predicate to liability is a finding that the corporation owed a duty of care to the victim, the duty was delegated to the officer and the officer breached the duty of care by his own conduct." Ibid. Under this theory, a corporate officer can be held individually liable for tortious conduct committed by the corporation if he or she participated in that conduct and it resulted in injury to the plaintiff. Id. at 309.

The Court observed that most New Jersey cases applied the participation theory to intentional torts such as fraud or conversion and that the theory also applied to certain statutory violations. Id. at 304-05; see Allen v. V. & A. Bros., 208 N.J. 114, 136 (2011) (holding individual liability for violation of Consumer

60

Fraud Act depended on evaluation of specific source of claimed violation and particular acts undertaken by individual); Van Natta Mech. Corp. v. Di Staulo, 277 N.J. Super. 175, 191 (App. Div. 1994) (holding corporate officer acting on behalf of corporation was liable to persons injured by his or her own torts). The Saltiel Court, however, held that the theory did not apply where breach of the corporation's duty was governed by contract law. Id. at 309, 318 (holding participation theory inapplicable because contract law governed duty of corporate officers).

Here, plaintiffs presented no evidence that Silver Hanger or O'Connor participated in negligent conduct. They do not cite actions performed by O'Connor that constituted a breach of any duty owed by the corporation. Instead, they argue that he operated Atlantic Cleaners for more than a decade during which time he used PCE, and that he was "intimately involved in its management and operation." They note that O'Connor handled, stored and removed the PCE, that he oversaw "the management, oversight, and implementation of policies concerning same," that he performed routine maintenance on the dry-cleaning machine, and that he was in "exclusive possession of the premises during the time the PCE was discharged and discovered."

However, O'Connor testified without contradiction that there were policies for daily monitoring and handling of PCE, and that employees were required to confirm their compliance by way of a "checklist." He stated that every day the operator felt around the machine and looked underneath it for leaks, inspected the pipe connections, fittings, couplings and valves, along with the filter gaskets, solvent tanks, containers, and waste separator, and performed daily leak inspections using a halogen detector. O'Connor also testified that government authorities inspected the dry-cleaning machine over the years and never cited Silver Hanger for noncompliance. Plaintiffs' conclusory arguments that O'Connor participated in a tort are without any basis in the record. The trial court did not err in dismissing plaintiffs' claims against O'Connor individually.

D.

Plaintiffs also contend the court erred in dismissing their claims asserted under the ERA. Because we have determined that plaintiffs cannot sustain their claims without expert evidence and the expert opinion rendered was net opinion and not grounded in fact, there was no basis to support an ERA claim. In addition, plaintiffs were not seeking to enforce environmental laws or pursuing declaratory relief or civil penalties pursuant to the ERA. See N.J.S.A. 2A:35A-4(a). They were seeking damages for the decreased value of their property,

damages not permitted under the ERA. See Birchwood Lakes Colony Club, Inc. v. Borough of Medford Lakes, 179 N.J. Super. 409, 414 (App. Div. 1981) (stating the ERA does not provide for the recovery of money damages).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1793-18